UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STELLA CRISTINA GOMES DE SOUZA,<br><br>Plaintiff,<br><br>-against-<br><br>WATCHTOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA, INC.;<br>WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.; and<br>THE GOVERNING BODY OF JEHOVAH'S WITNESSES,<br><br>Defendants. | Case No.: 1:25-cv-9458<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stella Cristina Gomes de Souza ("Plaintiff" or "Ms. Souza"), by and through her attorneys, McLaughlin & Stern, LLP, as and for her complaint against Watchtower Bible and Tract Society of Pennsylvania, Inc. ("Watchtower Pennsylvania"), Watchtower Bible and Tract Society of New York, Inc. ("Watchtower New York"), and the Governing Body of Jehovah's Witnesses (the "Governing Body") (collectively, the "Jehovah's Witnesses" or "Defendants"), alleges upon personal knowledge as to herself and upon information and belief as to all other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.      Ms. Souza brings this action for damages for the repeated rapes, sexual assault, and sexual battery she endured as a twelve-year-old child at the hands of Angelo Roviezzo ("Roviezzo"), then a Circuit Overseer for Jehovah's Witnesses in São Paulo, Brazil, and senior minister entrusted with supervising multiple congregations, and Defendants' gross negligence and intentional cover-up of Roviezzo's heinous crimes.

2.      As further set forth below, for nearly a year beginning in 2011, Roviezzo exploited his authority and position of trust to isolate and prey upon Ms. Souza within the very Kingdom Hall where she worshiped. He used his ministerial status to isolate, groom, and control Ms. Souza, subjecting her to ongoing sexual violence that included forcing her to undress, masturbating in front of her, forcing her to watch pornography, and raping her on a weekly basis.

3.      On several occasions, Roviezzo raped Ms. Souza inside the Assembly Hall of Jehovah's Witnesses in Mariporã itself—sometimes while thousands of worshippers were gathered outside, covering her mouth to silence her cries and commanding that she remain quiet while congregants and her own family stood just outside the room—and on other occasions at his own home, where he warned that if Ms. Souza spoke out, she would be expelled and shunned by her faith community.

4.      Ultimately, Roviezzo's abuse and repeated rapes culminated with Ms. Souza becoming pregnant.  Concerned about what would happen if anyone found out, she began drinking and exercising excessively, thinking it might hide the pregnancy.  In January 2012, at 13-years old, Ms. Souza had a miscarriage at her home in the bathroom.  Nobody took her to a hospital.

5.      The harm Ms. Souza suffered was compounded not only by the acts of Roviezzo, but by an organization-wide cover-up directed by the leadership of Jehovah's Witnesses. Despite receiving multiple reports and letters disclosing the abuse—including written pleas to Elders, Circuit Overseers, and the Brazilian Branch Office—and despite that the abuse was readily apparent, Defendants in both Brazil and New York failed to alert authorities. Instead, they silenced Ms. Souza, punished her for "misconduct," and transferred Roviezzo to another congregation. Incredulously, internal *Guidelines for Branch Office Service Desks* instructed Elders to conceal allegations of child sexual abuse and to refrain from contacting law-enforcement officials.

6.      In 2013, while still struggling with the effects of the abuse and isolation imposed by Roviezzo and the congregation, Ms. Souza was targeted again by another member of the Jehovah's Witnesses community, Adelmo Batista, who initiated sexually explicit communications and further exploited her vulnerability. Local Elders became aware of Batista's predatory conduct yet failed to act, choosing instead to protect the congregation's image. The continuation of abuse within the same congregation underscored a systemic failure and a culture of concealment.

7.      These actions, conceived and directed from Defendants' New York headquarters and replicated by their Brazilian Branch Office, were not isolated failures but the product of an entrenched, global policy of obstruction and concealment. Defendants prioritized institutional reputation over the safety of the children entrusted to their care, systematically silencing victims and protecting abusers.

8.      In 2023, after more than a decade of silence and trauma, Brazilian authorities arrested Roviezzo. He was convicted and sentenced to 15 years and 9 months in prison for child sexual abuse and rape.

9.      As a direct result of the heinous acts perpetrated against her and the subsequent cover-up, Plaintiff suffered—and continues to suffer—profound physical and emotional injuries, including infertility, chronic pain, severe depression, post-traumatic stress disorder, and suicide attempts. She has been formally diagnosed with complex trauma and major depressive disorder and remains unable to sustain employment due to the severity of her symptoms. She brings this action so that the Defendants responsible for enabling this abuse are finally held accountable.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between a citizen of the United Kingdom and citizens of the United States.

11.     Watchtower Pennsylvania is a Pennsylvania nonprofit religious corporation with its principal offices at 625 Red Mills Road, Wallkill, New York 12589. Watchtower Pennsylvania serves as a parent and policy-making entity for the Jehovah's Witnesses organization. It holds title to intellectual property, controls the worldwide publication of religious materials, and provides administrative direction and financial oversight to Branch Offices across the globe, including Brazil.

12.     Watchtower New York is a New York nonprofit religious corporation with its principal offices at 100 Watchtower Drive, Patterson, New York 12563. Watchtower New York functions as the administrative and publishing arm of the organization. It enforces global policies regarding the appointment, discipline, and transfer of Elders and directs implementation of procedures for addressing allegations of child sexual abuse.

13.     The Governing Body is an unincorporated association headquartered at 1 Kings Drive, Tuxedo Park, New York 10987. The Governing Body serves as the highest decision-making authority of Jehovah's Witnesses worldwide. It issues binding directives through "Letters to Bodies of Elders," "Branch Office Guidelines," and other internal publications that govern how all allegations of misconduct, including child sexual abuse, are to be handled. The Governing Body retains ultimate authority to approve or deny the appointment, removal, disfellowshipping, or reinstatement of any minister or Elder.

4

14.     At all relevant times, the Governing Body of Jehovah's Witnesses functioned as a centralized, decision-making authority with hierarchical control over ministerial appointments, supervision, and discipline. It maintained a distinct headquarters in New York and exercised ultimate oversight of all congregations, including those in Brazil. This structure ensured that policies concerning child-abuse reporting and discipline emanated directly from New York.

15.     Each of the Defendants transact continuous business within this District and exercises centralized control over the international network of Jehovah's Witnesses congregations. From their New York command centers, Defendants collectively direct and enforce the global policies that required Elders to conceal reports of child sexual abuse, discouraged victims from contacting secular authorities, and dictated the reassignment of offending ministers such as Roviezzo. The injuries suffered by Ms. Souza in Brazil were a foreseeable result of these New York-based decisions. Exercising personal jurisdiction over Defendants therefore comports with due process and traditional notions of fair play and substantial justice.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(2) because at least one of the Defendants resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs claims—including the development and enforcement of policies mandating secrecy and discouraging reporting of child sexual abuse—occurred within this District.

17.     Pursuant to CPLR § 208(b) (*i.e.*, the New York Child Victims Act), Plaintiff's claims are timely as the statute expressly permits civil actions based upon criminal conduct perpetrated against a minor to bring an action until the victim reaches the age of 55 years old.

## PARTIES

18.     Ms. Souza is now a 27-year-old adult female residing in Stafford, England. Ms. Souza was repeatedly sexually abused as a minor while she was a member of the Jehovah's Witnesses.

19.     Watchtower Pennsylvania is a Pennsylvania nonprofit corporation that serves as the principal corporate entity of Jehovah's Witnesses worldwide and provides organizational, publishing, and financial oversight to Branch Offices internationally.

20.     Watchtower New York is a New York nonprofit corporation that functions as the administrative and publishing arm of the organization and enforces policies developed by the Governing Body.

21.     The Governing Body is an unincorporated association headquartered in New York and serves as the highest decision-making authority of Jehovah's Witnesses worldwide.

## THE JEHOVAH'S WITNESSES' HIERARCHY AND CENTRALIZED CONTROL

22.     Jehovah's Witnesses operate under a rigid, hierarchical structure in which all congregations and Branch Offices are subject to the ultimate control of the Governing Body in New York. The Governing Body issues written directives known as "Letters to Bodies of Elders," "Branch Office Guidelines," and "Service Desk Instructions," which govern every aspect of organizational life—from congregation discipline to how allegations of sexual abuse must be handled.

23.     Local Elders have no independent authority to remove a minister or initiate reporting to secular authorities without authorization from the New York headquarters. No disfellowshipping, reinstatement, or reassignment of an Elder can occur without prior approval

from New York. This centralized system ensures that policy decisions concerning abuse cases are made, implemented, and supervised by Defendants within this District.

24.     Internal Jehovah's Witnesses documents explicitly demonstrate indifference to child protection. These materials instruct Elders to maintain strict confidentiality, discourage reporting to civil authorities, and, in some cases, permit the reinstatement of offenders found guilty of child sexual abuse after a brief period of repentance. Such practices reveal a pattern of willful disregard for victims' safety and the law.

25.     For example, the Guidelines for Branch Service Desk dated September 1, 2005 provide that a former child molester is not automatically disqualified from a responsible position in the congregation if the molestation took place before his baptism.  These Guidelines further provide that if a man molested a child before getting baptized and is already serving in a responsible position, he likely does not need to step aside. Rather, the Elders would consider the circumstances and make a recommendation.  The Guidelines further provide that if a man molested a child years ago after getting baptized, it is possible for him to retain his privilege of service.

26.     Self-evidently, these Guidelines reflect an utter dereliction of Jehovah's Witnesses' duty to exercise care and prevent abuse of minors in their organization.  In fact, these Guidelines reflect the exact opposite: allowing child molesters to retain positions of privilege within the community.

### FACTUAL ALLEGATIONS

**A.  Roviezzo Exploited His Position as a Minister to Abuse Ms. Souza When She Was a Child**

27.     Ms. Souza was born a third-generation Jehovah's Witnesses and a member of the Estrada da Fonte congregation since her birth.  From a young age, she was taught to respect and obey those "appointed by Jehovah" to lead the congregation without question, and that anyone

outside the organization posed a serious risk to her safety as they were "people of the world" who did not obey Jehovah.

28.     Roviezzo, the new Circuit Overseer for the region, arrived in 2010. Ms. Souza initially viewed and trusted him as a spiritual authority who could protect her and guide her. Over time, Roviezzo used that trust to isolate and manipulate Ms. Souza under the guise of pastoral attention, quickly eviscerating the boundaries between religious mentorship and personal control for his own perverse sexual gratification.

29.     On May 16, 2011, when she was just 12 years old, Roviezzo sexually assaulted Ms. Souza for the time, rubbing his penis against her and running his hands over her body, telling her how beautiful she was.  A few days later, Roviezzo lured Ms. Souza into the Kingdom Hall under the pretext that he needed a document that he had lent Ms. Souza's sister.  Upon Ms. Souza's arrival, Roviezzo asked if she was a virgin before he proceeded to sexually assault her.

30.     From there, Roviezzo sexually assaulted Ms. Souza on a weekly basis.  Soon after the initial assaults began, Ms. Souza informed her father and grandmother that she no longer wished to visit congregations with Roviezzo, but could not bring herself to disclose the true reason why.  Her grandmother dismissed her concerns, calling her ungrateful, and forced her to continue accompanying him. It was plainly evident to those around her—including Elders and other members of the congregation—that Ms. Souza was terrified of being alone with Roviezzo and repeatedly tried to avoid his company. Despite her visible distress, trembling, and emotional withdrawal during meetings and field service, no one in the congregation intervened or asked why. The Elders' refusal to inquire or act, despite these clear warning signs, reflected deliberate indifference to Ms. Souza's safety and further enabled Roviezzo's abuse to continue unchecked.

31.     Sexual abuse and rape became a part of Ms. Souza's daily life.  Despite repeatedly begging Roviezzo to stop, he continued to abuse her and made her masturbate him, forced her to watch pornography, showed her how to use a condom, and asked her if he should ejaculate inside or outside of her, before ultimately raping her.  Roviezzo implored Ms. Souza not to inform anyone because he was married and that if she did, she would be disowned.

32.     Some of the abuse occurred during visits to other congregations.  For example, Roviezzo took Ms. Souza and her sister to another congregation in São Paulo and during the field work, he took Ms. Souza to the Kingdom Hall, knowing there would be nobody there so he could rape her.  On one occasion, Roviezzo sexually abused Ms. Souza while 5,000 people were outside the Assembly Hall of Jehovah's Witnesses.  On yet another occasion, Roviezzo took Ms. Souza to his house and raped her, while she could hear people outside talking and laughing.  When Roviezzo heard Ms. Souza's sister calling for her, he covered her mouth with his hand and told her to be quiet.  When he finished, he gave Ms. Souza a cloth to clean herself and returned to the Kingdom Hall as if nothing had happened.

33.     At 13 years old, Ms. Souza began drinking alcohol excessively to cope with the sexual and physical abuse.  Although her family and members of the congregation were aware that she was drinking, they chalked it up to a rebellious phase, rather than address the truth: she was self-medicating to cope with the abuse and rapes perpetrated against her by Roviezzo on a nearly daily basis.

34.     In November 2011, Ms. Souza found out that she was pregnant.  Concerned about what would happen if anyone found out, she began drinking until she blacked out and exercising excessively, thinking it might hide the pregnancy.  On January 17, 2012, while preaching door-to-

door, Ms. Souza began feeling sick and bleeding heavily. Ultimately, as a result, Ms. Souza had a miscarriage at her home in the bathroom. Nobody, however, took her to a hospital.

**B.  The Organization Knew of Prior Misconduct and Chose to Conceal It**

35.    Elders within the Estrada da Fonte congregation and regional overseers had received earlier warnings about Roviezzos inappropriate behavior with minors, including concerns raised by families in nearby congregations, but no protective action was taken. Those reports were handled internally, consistent with Defendants' policy that discouraged contact with secular authorities and required Elders to seek branch approval before taking any disciplinary measures. This failure to intervene enabled Roviezzo's misconduct to continue unchecked.

36.    Every time Ms. Souza tried to speak with an Elder or another member of the congregation about the abuse she was suffering, she was met with resistance.

37.    In January 2012, during a door-to-door service, Hackson de Souza Paiva ("Hackson"), a friend of Ms. Souza's, noticed that she looked ill and convinced her to confide in him what was happening. Ms. Souza informed Hackson that she was being sexually abused and raped by Roviezzo. Hackson encouraged Ms. Souza to inform the Elders during a special meeting in Mariporã, where a member of the governing body, Guy Pierce, was in São Paulo to supervise Jehovah's Witnesses' activity in Brazil.

38.    On January 29, 2012, Ms. Souza informed Elder Ademir Pires Domingues of the assault and rapes. She brought with her printed text message conversations she had with Roviezzo, which confirmed the sexual abuse and rape. Elder Ademir Pires Domingues informed Ms. Souza that he would investigate her allegations. Ms. Souza then went to her uncle's house, who was also an Elder, out of fear what Roviezzo might do in retaliation for her complaints. Ms. Souza was so

anxious that her aunt gave her a sedative and when she woke up, there were several Elders in her uncle's house who were informed of the rape and assaults.

39.    The following day, the Elders made Ms. Souza write a letter outlining the assaults and rapes perpetrated against her and took her MSN account password—*i.e.*, the messaging service that Roviezzo used to communicate with her—and used it to access and review her private messages. Despite still being a minor, and despite the overwhelming evidence confirming that Roviezzo repeatedly and systematically abused Ms. Souza, the Elders directed Ms. Souza to keep quiet, manipulating her and telling her that if she truly loved Jehovah and the organization, she would not speak about what happened ever again.  She was explicitly told by the Elders to "leave it in Jehovah's hands."

40.    The Elders' egregious handling of Ms. Souza's report followed written directives issued by Defendants' headquarters requiring all allegations of child abuse to be referred to the branch office rather than civil authorities. Those same policies cautioned Elders against interviewing victims without branch approval and instructed them to maintain confidentiality to avoid "bringing reproach on Jehovah's name." In accordance with these organizational rules, Defendants knowingly suppressed a credible report of child sexual abuse, allowed Roviezzo to remain in ministry, and exposed Ms. Souza to further trauma.

41.    Within a week, Roviezzo was transferred to another region, confirming Defendants' knowledge of Roviezzo's outrageous and heinous conduct.  Such transfers cannot occur without explicit approval from Defendants' New York headquarters, which exercises centralized authority over all ministerial appointments, removals, and reassignments worldwide. Roviezzo's transfer, therefore, confirms that the Governing Body and Watchtower leadership were aware of the allegations against Roviezzo and actively directed the concealment of his misconduct. Plaintiff

was intentionally excluded from any further information regarding Roviezzo's ministerial status following his transfer, reflecting Defendants' practice of shielding such *de minimis* disciplinary decisions from victims and the congregation.

42.    However, nobody from Jehovah's Witnesses would speak with Ms. Souza about what happened, despite her repeated efforts to talk with the Elders of her congregation.  Ms. Souza began experiencing constant panic attacks, severe anxiety and depression, and was so thin that other members of the congregation expressed concern over her health.

43.    Only then did the Elders meet with Ms. Souza to discuss what happened.  However, rather than trust Ms. Souza and the detailed contemporaneous evidence confirming the assaults and rapes, the Elders expressed skepticism, questioning why Ms. Souza did not scream and why she would let Roviezzo do that to her.

44.    The next day, Ms. Souza was picked up from school by three Elders (Jose Guilherme, Fabio Rodrigues, and Carlos Roberto) and taken to the Andes congregation to again explain what happened, this time to a judicial committee of the Jehovah's Witnesses. The committee also had printed copies of additional conversations between Ms. Souza and Roviezzo, which they read aloud during the meeting. Incredulously, after detailing the numerous assaults and rapes to the committee, Roviezzo was called into this meeting and the committee demanded that Ms. Souza repeat everything she shared with the committee in front of Roviezzo.

45.    Having to explain to five male members of the judicial committee and Roviezzo what Roviezzo did to her was incredibly traumatizing for Ms. Souza.  It was as if Ms. Souza was being abused all over again.

46.    During this meeting, the members of the committee read from text messages between Ms. Souza and Roviezzo in which he admitted that "**You caught me**."  Roviezzo also

admitted to sexual assault, explicitly admitting that he continued to assault Ms. Souza even after

she tried to stop him, and used Scripture to normalize sexual acts with a minor.

47.    Specifically, when Ms. Souza reminded Roviezzo that she attempted to push him

away during the assault, the following exchange occurred:

> **Plaintiff: I told you to stop.**
> **Roviezzo: When I tried to push you after you said that, and**
> **you did not stop.**
> **Plaintiff: I was scared.**
> **Roviezzo: I know. But it happened.**

48.    Roviezzo also acknowledged the prior assault and minimized it as a loss of

control:

> **Roviezzo: Sorry, I couldn't control myself yesterday. Did you**
> **feel it?**

49.    Roviezzo then described the size and thickness of his penis to her and instructed

her to measure it against her own hand:

> **Roviezzo: 18 cm. Now open your hand and close it with your fingers**
> **together without bending them. That is how thick it is, maybe a bit**
> **more, because you have small fingers.**

50.    Further abusing his power, Roviezzo invoked Scripture to justify his sexual actions:

> **Roviezzo: Check Genesis 35:8,9. It is about spilling the sperm**
> **on the earth. It is better, don't you think?**
> **Plaintiff: I don't understand.**
> **Roviezzo: You will learn.**

51.    Roviezzo then attempted to normalize sexual activity with her by invoking

Jehovah's Witness religious literature:

> **Plaintiff: I feel confused.**
> **Roviezzo: It is normal to feel like having sex, Stella. The book**
> ***Young People Ask* says it is normal.**

52.    Roviezzo also sought to control Ms. Souza's sexual experiences and demanded

exclusivity:

> **Roviezzo: I want it to be with me. But if it is not with me, I
> want you to tell me who it was with.**

53.     Roviezzo emphasized the age imbalance and positioned himself as Ms. Souza's

sexual instructor:

> **Roviezzo: I'm 51 years of age, Stella, not 15 . . . . I want to
> teach you. I want to teach you everything like a teacher.[1]**

54.     After 5 hours of constant questioning, Ms. Souza was dismissed by the committee

and told to "leave it in Jehovah's hands" and not to speak about it again.  She was further directed

that if anyone asked her about Roviezzo to respond that he had to take leave to care for his father.

55.     Several weeks later, Ms. Souza was informed that she could no longer serve as a

regular pioneer for Jehovah's Witnesses.   The following week, it was announced to the

congregation that Ms. Souza was no longer a pioneer, but no announcement was made concerning

Roviezzo.  In other words, Jehovah's Witnesses punished Ms. Souza for reporting the sexual abuse

she was subjected to, and did nothing to punish the actual abuser.

56.     Rumors began to spread throughout the congregation that Ms. Souza had a

consensual affair with Roviezzo.  Ms. Souza was called a whore and a bad influence.  Her friends

started to distance themselves from her and she was no longer welcome at events.

57.     It was then that she tried to kill herself for the first time.  Thankfully, her attempt

was unsuccessful.  Unfortunately, it was not the last time she would attempt to take her own life

as a result of the trauma and pain caused by Roviezzo and Jehovah's Witnesses.

58.     In 2013, Ms. Souza met Batista, who had recently moved to her congregation with

his wife.  Within a few weeks, he started messaging her on Facebook.  Friendly at first, the

---

[1]     Annexed hereto as Exhibit 1 are true and correct complete copies of the above messages
exchanged between Ms. Souza and Roviezzo in Portuguese, together with accurate English
translations, which reflect his admissions and statements confirming the sexual abuse.

conversations changed quickly, and he offered to protect her if she would agree to have sex with him:

> **Batista: You looked very pretty. With all respect.**
> **Batista: I could be your personal bodyguard if you want. A big,**
> **strong man for when you go out.**

59.     Batista then transitioned the conversation from casual to explicitly sexual:

> **Batista: I like watching movies too. And sex. It's terrific. Have**
> **you ever tried it?**
> **Plaintiff: No.**
> **Batista: Popcorn, I think you would like it.**
> **Batista: I'm home alone if you want.**

60.     When Ms. Souza did not reciprocate, Batista reframed the interaction as an opportunity for him to "teach" her, echoing the same instructional grooming language used by Roviezzo:

> **Batista: Can I tell you something?**
> **Batista: I've always thought you are really hot. I could teach you**
> **a great deal.[2]**

61.     Ms. Souza was a minor during these communications. Batista was a congregation Elder, a spiritual authority figure entrusted by Defendants to provide moral oversight, pastoral guidance, and protection. Instead, Defendants allowed him direct access to children and young congregants, where he used his authority to groom and solicit sexual involvement.

62.     Ms. Souza showed the messages to the Elders in her congregation, and rather than protect her, they responded that this is what happens when you're "too pretty." A few days later,

---

[2]     Annexed hereto as Exhibit 2 are true and correct copies of the original Portuguese text message exchanges between Ms. Souza and Batista, together with accurate English translations, which reflect Batista's communications offering to "protect" her in exchange for sex and his subsequent messages to her.

Ms. Souza was informed that the Elders had spoken with Batista and that she was to stay away from him. Some time later, he was promoted to Elder.

63.    Years later, when Ms. Souza was 18 years old, her aunt and uncle received anonymous letters containing conversations between Ms. Souza and Roviezzo, which clearly reflected that Roviezzo had been sexually assaulting and raping Ms. Souza.  When Ms. Souza confided in them what happened, they were rightfully aghast.  They encouraged Ms. Souza to go to the police, where she submitted a police report.  Ms. Souza started receiving death threats from members of the congregation, threatening to kill her if she pursued the matter further.

64.    Numerous witnesses submitted sworn statements to the police in July 2017, including Ms. Souza's aunt, her sister, Hackson de Souza Paiva, family friend Jose Guilherme Gomes, her uncle, and her grandmother. Each attested under oath that Roviezzo raped and sexually assaulted Ms. Souza while she was a minor. Notably, Plaintiff's sisters personally witnessed one of the assaults firsthand and later confirmed what they saw to law enforcement, providing further corroboration of Roviezzo's crimes. True and correct copies of these witness statements are annexed hereto as Exhibit 3.

### C.  Plaintiff's Efforts to Report the Abuse and Seek Accountability Were Met with Silence and Retaliation

65.    Ms. Souza later wrote to Bethel—the head branch office of Jehovah's Witnesses in Brazil—to ask for help. In response, two Elders (Joao Araujo and Paulo Martins) arrived at her aunt's house, but rather than offer assistance, they tried to convince Ms. Souza to drop her complaint against Roviezzo.  Ms. Souza's aunt and uncle were subsequently stripped of their privileges in the congregation, in clear retaliation for assisting Ms. Souza. Plaintiff possesses copies of these letters and will produce them in discovery.

66.     In an effort to put the trauma and pain of her youth behind her, Ms. Souza moved to England and married, but despite her efforts to live a normal life, she still carries the trauma from the childhood rapes and assaults she suffered.  She continues to have severe panic attacks and suffers from anxiety and depression. Ms. Souza has undergone extensive psychological treatment and has been formally diagnosed with post-traumatic stress disorder (PTSD), complex trauma, and major depressive disorder. She was hospitalized multiple times following panic attacks and continues to receive ongoing psychiatric care and therapy to manage her symptoms.

67.     In September 2023, Ms. Souza learned that Roviezzo was arrested as a result of her criminal complaint. She subsequently joined a support group with other former Jehovah's Witnesses members, and received internal documents exchanged between the New York and Brazil offices.

68.     After receipt of these documents, Ms. Souza wrote to the corporate headquarters of Jehovah's Witnesses in New York City, asking for an opportunity to speak further about her abuse. A true and correct copy of this correspondence is in Plaintiff's possession and will be produced in discovery.

69.     Importantly, this was not the first time the corporate office had been made aware of child sexual abuse within its ranks; Defendants had long received reports of similar misconduct from other congregations around the world and consistently directed local branches to handle such matters internally rather than report them to authorities.

70.     In direct response to Ms. Souza's letters to the Jehovah's Witnesses corporate headquarters in New York, in or around February 2025, the Jehovah's Witnesses corporate office in New York communicated with Ms. Souza's husband concerning the allegations.

71.     Then, in or around April 2025, Jehovah's Witnesses' New York office dispatched two representatives (Ray Shah, Circuit Overseer, and James Onion, Elder) to speak with her in England, where she resided. During this meeting, Ray Shah stated to Ms. Souza, in sum and substance: "the Governing Body is aware of your case and they wanted me to let you know that whatever you want — monetary — they will agree on. Just give us a number, any number, any amount, you decide".   In June 2025, two additional representatives (Walker and Matthews) informed her that Roviezzo was disfellowshipped in 2017 and that Roviezzo had confessed to his crimes in or around 2012, nearly 5 years **before** he was disfellowshipped.  They further informed her that as early as 2012 it was determined that Roviezzo committed child sexual abuse and was reproved by Jehovah's Witnesses.

72.     Critically, Roviezzo's disfellowshipping at that time required approval from the New York headquarters, as no Elder or minister could be removed, reproved, or reinstated without authorization from the Governing Body. This confirms that the Governing Body and Watchtower leadership in New York were not merely informed but actively sanctioned and directed the handling of Roviezzo's discipline, evidencing their knowing participation in the continued cover-up.

73.     When Ms. Souza inquired why her privileges were revoked despite Roviezzo's confession, she was merely told that she "makes a very good point."  Incredulously, despite acknowledging that Ms. Souza was "the victim of child abuse," the two representatives confirmed that Roviezzo was reinstated as a Jehovah's Witness in June 2025, approximately one week before the above-described June 19 conversation, while serving his prison sentence.

74.     The Jehovah's Witnesses then offered Ms. Souza a meager $50,000 in compensation for the pain and suffering she experienced, all-the-while stating that "***there is no***

*amount of financial recourse that can take away what [Ms. Souza] experienced,"* and that "you've been through so much… we feel so sorry, Stella, for all you had to go through." Yet, even as they acknowledged that she was "the victim of child abuse" and that "a victim of child abuse is a victim, period… should feel protected, should feel safe, should feel loved," they offered only a token payment and no meaningful accountability. As this amount in no way reflected the suffering she endured over the years, she rejected their offer and contacted counsel to pursue relief.

### D. The Abuse and Concealment Left Plaintiff with Lifelong Physical and Psychological Injuries

75. Ms. Souza has suffered, and continues to suffer, severe emotional and physical distress as a result of Roviezzo's and the Jehovah's Witnesses' actions. She suffers from severe anxiety and depression and continues to undergo therapy and medical treatment for her psychological injuries. As a direct consequence of the rape and miscarriage she suffered as a minor, Ms. Souza is unable to carry children and has suicidal ideation. Her emotional and physical injuries have persisted for more than a decade and are expected to be permanent.

76. The lasting impact of these injuries continues to affect every aspect of Ms. Souza's life, including her ability to work. Most recently, on October 14, 2025, her treating provider at Wolverhampton Road Surgery in Stafford, United Kingdom, issued a Statement of Fitness for Work certifying that she is not fit for work due to anxiety for the period of September 4 through November 11, 2025, consistent with her long-standing diagnoses of severe anxiety and depression.

## COUNT ONE

### (Negligent Supervision and Retention)

77.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

78.     As set forth herein, Defendants owed Plaintiff a duty of reasonable care to protect her and other minors within their congregations from foreseeable harm, including sexual abuse by clergy, Elders, and ministerial representatives acting under their authority. This duty included the obligation to properly screen, train, supervise, and, when necessary, remove individuals whose conduct posed a danger to congregants.

79.     Defendants maintained a rigid and centralized hierarchy through which the Governing Body in New York exercised ultimate control over the appointment, discipline, and supervision of all Elders and ministerial servants worldwide. Authority flowed downward from the Governing Body to Branch Offices and then to local congregations, leaving no independent discretion at the local level. This centralized structure placed the Governing Body and Watchtower entities in direct control of ministerial oversight, making their knowledge and response to reports of misconduct foreseeable and actionable.

80.     Defendants knew or should have known that Roviezzo had engaged in inappropriate conduct with minors and exhibited predatory behavior inconsistent with his ministerial role. Despite this knowledge, Defendants failed to restrict his access to children, monitor his conduct, or investigate prior complaints.

81.     Despite numerous reports, letters, and warnings indicating that Roviezzo's behavior toward minors was improper, Defendants failed to remove or discipline him. Instead, they maintained him in a position of authority and allowed him continued contact with Plaintiff and other vulnerable children, thereby enabling his repeated sexual assaults.

82.    Upon information and belief, any decision regarding Roviezzo's assignment, removal, or discipline required approval from Defendants' New York headquarters. By allowing Roviezzo to remain in his position, Defendants negligently supervised and retained him, demonstrating disregard for the safety of minors under their care.

83.    Defendants' failure to supervise, train, and remove Roviezzo created a foreseeable and unreasonable risk of harm to Plaintiff. Their inaction, despite clear warning signs, constituted a breach of their duty of care.

84.    As a direct and proximate result of Defendants' negligent supervision and retention, Plaintiff suffered repeated sexual assaults, emotional distress, infertility, post-traumatic stress disorder, and long-term psychological trauma.

85.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT TWO

### (Gross Negligence)

86.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

87.    As set forth herein, Defendants owed Plaintiff a duty of reasonable care to protect her and other minors within their congregations from foreseeable harm, including sexual abuse including sexual abuse by clergy, Elders, and ministerial representatives.

88.    This duty arose from Defendants' hierarchical structure and their assumption of control over the appointment, supervision, and discipline of Elders, Overseers, and other ministerial representatives.

89.    Defendants knew or should have known that individuals such as Roviezzo posed a danger to children based on prior reports of inappropriate conduct within Brazil and other congregations worldwide. Despite this knowledge, Defendants failed to act, instead concealing the abuse and enabling Roviezzo to maintain his ministerial role and continued access to minors.

90.    Defendants promulgated and enforced internal policies—including the *Guidelines for Branch Office Service Desks, Letters to Bodies of Elders*, and other confidential directives— requiring Elders to report allegations of child sexual abuse solely to the Branch Office and prohibiting disclosure to law enforcement without explicit approval from the New York headquarters.

91.    Defendants exercised centralized control over all ministerial appointments, removals, and disciplinary actions, ensuring that no Elder, Ministerial Servant, or Overseer could be sanctioned, reproved, or disfellowshipped without the approval of the New York leadership. This structure ensured that Defendants were fully aware of credible allegations of child sexual abuse, including those involving Roviezzo, and that their inaction directly facilitated his continued abuse of Plaintiff.

92.    Defendants' gross negligence was not an isolated failure but part of a systemic pattern of reckless indifference to the welfare of minors, as evidenced by similar reports of child sexual abuse and cover-ups across multiple jurisdictions. Their deliberate refusal to protect victims or alert civil authorities created a foreseeable and extreme risk of harm that materialized in Plaintiff's repeated assaults and lasting trauma.

93.    As a direct and proximate result of Defendants' gross negligence, Plaintiff suffered severe and permanent physical, psychological, and emotional injuries, including infertility, post-

traumatic stress disorder, complex trauma, major depressive disorder, and an inability to maintain employment due to the severity of her symptoms.

94.     Defendants' conduct was so reckless and wanton as to constitute a willful disregard for human life and safety, thereby justifying an award of punitive damages to punish and deter such conduct in the future.

95.     As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT THREE

### (Negligence)

96.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

97.     Defendants owed Plaintiff a duty of reasonable care to protect her and other minors within their congregations from foreseeable harm, including sexual abuse perpetrated by individuals acting under their authority. This duty arose from Defendants' hierarchical structure and their assumption of control over the appointment, supervision, and discipline of Elders, Overseers, and other ministerial representatives.

98.     Defendants breached this duty by failing to implement and enforce reasonable safeguarding measures, by negligently hiring, supervising, and retaining individuals such as Roviezzo, and by failing to remove or restrict access to minors for clergy and Elders with known or suspected histories of misconduct.

99.     Defendants further breached their duty by maintaining inadequate screening, reporting, and oversight procedures that prioritized institutional reputation over child protection. Defendants negligently permitted Elders and Overseers to handle allegations of child sexual abuse

internally, rather than reporting them to civil authorities, thereby creating an unreasonable and foreseeable risk of further harm.

100.    Through their top-down command structure, Defendants exercised centralized authority over all congregational operations and disciplinary decisions. No Elder, Ministerial Servant, or Overseer could be appointed, reproved, removed, or reinstated without the approval of the New York headquarters. As such, Defendants had actual or constructive notice of Roviezzo's conduct and directed or condoned his reassignment rather than ensuring his removal or reporting his crimes.

101.    Defendants knew or should have known that their failure to act on credible reports of abuse, to monitor known offenders, and to implement effective child-safety measures created an unreasonable and foreseeable risk of injury to minors, including Plaintiff. Their acts and omissions fell far below the standard of care owed by an organization exercising authority and supervision over vulnerable congregants.

102.    Defendants' negligence was a direct and proximate cause of Plaintiff's injuries, including repeated sexual assaults, forced abortion, infertility, post-traumatic stress disorder, major depressive disorder, and lifelong psychological trauma.

103.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT FOUR

### (*Respondeat Superior*/Vicarious Liability)

104.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

105.    At all relevant times, Roviezzo acted as an agent, minister, and representative of Defendants, performing duties within the course and scope of his ministry and under their authority and control.

106.    Defendants are vicariously liable under the doctrine of *respondeat superior* for the tortious acts and omissions of Roviezzo and other clergy or Elders committed in furtherance of their ministerial roles and within the scope of their agency.

107.    Defendants' exercise of control over Roviezzo's ministerial functions, his assignments, and his continued authority within the congregation makes them jointly and severally liable for his misconduct and for the harm inflicted upon Plaintiff.

108.    As a direct and proximate result of the acts and omissions of Defendants and their agents, Plaintiff suffered severe and permanent physical, emotional, and psychological harm.

109.     As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT FIVE

### (Sexual Assault)

110.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

111.    As set forth herein, Defendants, by and through their minister and agent Roviezzo, intentionally subjected Plaintiff to repeated acts of sexual assault and other unpermitted, harmful, and offensive physical contact when she was a minor.

112.    These assaults occurred under the guise of spiritual counsel and ministry, while Roviezzo acted in his capacity as a Circuit Overseer entrusted by Defendants to supervise multiple congregations, counsel members, and oversee religious activity.

113.    Roviezzo's conduct—including forced intercourse and other sexual acts— constituted sexual assault and was carried out while exercising the authority and trust Defendants conferred upon him as a minister.

114.    Defendants are liable for these assaults both directly and vicariously. They appointed, supervised, and retained Roviezzo despite knowledge—or deliberate disregard—of prior warnings and his predatory behavior toward minors.

115.    Defendants are liable for the sexual assaults committed by their agent and minister, Roviezzo, because they conferred upon him actual and apparent authority to counsel, supervise, and interact with Plaintiff and other minors within the congregation. Defendants exercised control over his appointment, assignments, and supervision, and were aware or should have been aware of his predatory conduct.

116.    By maintaining Roviezzo in a position of ministerial authority, Defendants created and perpetuated the very opportunity for the assaults to occur and failed to protect Plaintiff from foreseeable harm.

117.    As a direct and proximate result of the sexual assaults, Plaintiff suffered severe and permanent injuries, including infertility, post-traumatic stress disorder, complex trauma, and major depressive disorder.

118.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT SIX

### (Sexual Battery)

119.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

120.    As set forth herein, Defendants, by and through their minister and agent Roviezzo, intentionally subjected Plaintiff to repeated harmful and offensive physical contact without her consent, including forced sexual acts and unwanted touching of a sexual nature.

121.    At all relevant times, Roviezzo served as a Circuit Overseer under Defendants' supervision and control, a senior minister entrusted with spiritual oversight of multiple congregations, the appointment and discipline of Elders, and the pastoral care of members, including minors such as Plaintiff.

122.    Roviezzo used the authority and influence Defendants conferred upon him to isolate, manipulate, and coerce Plaintiff into submitting to repeated sexual acts. He threatened that if she disclosed his conduct, she would be expelled and shunned by her congregation and family, leaving her with no means of support or belonging.

123.    Plaintiff, a twelve-year-old child at the time, lacked the capacity to consent to any sexual contact. Her submission to Roviezzo's assaults was obtained solely through fear, coercion, and psychological domination rooted in the spiritual authority Defendants gave him.

124.    Defendants knew or should have known that Roviezzo was unfit for his ministerial position and that his continued access to children posed a foreseeable risk of sexual abuse. Despite prior warnings and concerns, Defendants failed to remove or restrict him, thereby enabling and facilitating his repeated assaults on Plaintiff.

125.    These acts of sexual battery occurred while Roviezzo acted within the scope of his ministerial authority and under color of the office Defendants conferred upon him. Defendants are therefore liable for his conduct under the doctrines of agency and *respondeat superior*, as well as for their own negligent supervision, retention, and concealment of his misconduct.

126.    Defendants further promulgated and enforced internal policies that discouraged reporting child sexual abuse to civil authorities, directed Elders to maintain secrecy, and required branch approval before taking disciplinary action—all of which emboldened Roviezzo and perpetuated a culture of concealment.

127.    As a direct and proximate result of these sexual batteries, Plaintiff suffered severe and permanent injuries, including infertility, chronic pain, post-traumatic stress disorder, major depressive disorder, and complex trauma.

128.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT SEVEN

### (False Imprisonment)

129.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

130.    As set forth herein, at all relevant times, Defendants, through their minister and agent Roviezzo, unlawfully restrained and confined Plaintiff's freedom of movement without her consent and without legal justification.

131.    Roviezzo, acting under Defendants' authority as a Circuit Overseer, repeatedly isolated Plaintiff within Kingdom Hall rooms, vehicles, and private residences, preventing her from leaving and physically blocking her path when she attempted to do so.

132.    During these assaults, Roviezzo used his ministerial power and spiritual authority—granted and maintained by Defendants—to coerce Plaintiff's compliance. He threatened that if she resisted or told anyone, she would be disfellowshipped, expelled from the congregation, and permanently separated from her family and faith community.

133.    Plaintiff was a twelve-year-old child taught to obey Elders and Overseers as divinely appointed representatives of Jehovah. These indoctrinated beliefs, coupled with Roviezzo's physical control, rendered her incapable of leaving or seeking help.

134.    Defendants knew or should have known that their hierarchical structure and policies gave ministers like Roviezzo extraordinary authority over congregants, including minors, and that such unchecked authority created a foreseeable risk of coercive restraint and abuse.

135.    Despite prior warnings and reports of Roviezzo's misconduct, Defendants failed to restrict his access to children or remove him from his position, thereby enabling the confinement and assaults of Plaintiff to continue.

136.    Defendants further enforced internal rules that discouraged contact with secular authorities and required victims and witnesses to "leave matters in Jehovah's hands," effectively trapping Plaintiff within the organization and denying her any safe avenue for escape or protection.

137.    The confinement and psychological coercion imposed upon Plaintiff were directly caused by Defendants' negligent supervision, reckless policies, and willful disregard for her safety. These acts constituted a deprivation of liberty under color of religious authority.

138.    As a direct and proximate result of Defendants' false imprisonment, Plaintiff suffered severe emotional distress, trauma, panic attacks, and long-term psychological injuries, including post-traumatic stress disorder and major depressive disorder.

139.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## COUNT EIGHT

### (Intentional Infliction of Emotional Distress)

140.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

141.    As set forth herein, Defendants, through their minister and agent Roviezzo, engaged in extreme and outrageous conduct that intentionally or recklessly caused Plaintiff to suffer severe emotional distress.

142.    Roviezzo repeatedly raped and sexually assaulted Plaintiff, a twelve-year-old child, while acting under Defendants' authority and supervision. His acts of physical and psychological domination were carried out within Kingdom Halls and other congregation settings, places where Plaintiff was taught to feel spiritually safe.

143.    Defendants' agents—including Elders, Overseers, and members of the Branch Office—reinforced Roviezzo's authority and silenced Plaintiff when she attempted to disclose the abuse, directing her to "leave it in Jehovah's hands," warning her that she would be disfellowshipped if she spoke out, and treating her as a sinner rather than a victim.

144.    Defendants' written policies and hierarchical control ensured that reports of child sexual abuse were not reported to civil authorities, but were instead referred to the Branch Office for internal handling. By maintaining these policies and by failing to act against Roviezzo despite clear evidence of abuse, Defendants intentionally perpetuated Plaintiff's trauma and emotional suffering.

145.    Defendants' conduct was deliberate, extreme, and outrageous. Rather than protect a child, Defendants punished her, transferred her abuser, and reestablished him in ministry—all while claiming moral and spiritual authority. Such conduct transcends all bounds of decency tolerated in a civilized society.

146.    As a direct and foreseeable result of Defendants' actions and omissions, Plaintiff suffered severe and continuing emotional distress, including post-traumatic stress disorder, major depressive disorder, dissociation, panic attacks, and multiple suicide attempts. She has required ongoing psychiatric treatment and hospitalization.

147.    Defendants' actions were taken with malice and in conscious disregard for Plaintiff's welfare, justifying an award of punitive damages to punish and deter such conduct in the future.

148.    As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $100,000,000, together with attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Awarding Plaintiff compensatory damages on all counts in an amount to be determined at trial, but in any event not less than $100,000,000, together with interest, costs, and reasonable attorneys' fees;

B.  Awarding Plaintiff punitive and exemplary damages in an amount to be determined at trial and in an amount sufficient to punish Defendants for their willful, wanton, and reckless misconduct and to deter similar conduct in the future;

C.  Awarding Plaintiff pre-judgment interest, post-judgment interest, and costs and fees; and

D.  Awarding Plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

## DEMAND TO PRESERVE EVIDENCE

Defendants are hereby directed to preserve all physical and electronic information pertaining in in any way to Plaintiff and Plaintiff's employment, to Plaintiff's causes of action and/or prayers for relief, and to any defenses to same, including, but not limited to, electronic data storage, closed circuit TV footage, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages, any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook,

Twitter, Instagram, WhatsApp, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

Dated:  New York, New York                          MCLAUGHLIN & STERN, LLP
        November 12, 2025


                                            By:  */s/ Brett R. Gallaway*
                                                Brett R. Gallaway
                                                Jason S. Giaimo
                                                Hilary Quinn
                                      260 Madison Avenue
                                      New York, NY 10016
                                      Telephone: (212) 448-1100
                                      bgallway@mclaughlinstern.com
                                      jgiaimo@mclaughlinstern.com
                                      hquinn@mclaughlinstern.com
                                      *Attorneys for Plaintiff*